UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
CHARLES R. SELF, OREOLUWA SALAU,
JOYCE STENA, GLENN PETERKIN, and
PHYLLIS ANDERSON,

     08 Civ. 06743 (SHS)

    Plaintiffs,

     OPINION & ORDER

    -against-

DEPARTMENT OF EDUCATION OF THE CITY
OF NEW YORK, and HENRY RUBIO individually
and as Principal of Randolph High School, and
ROSALIE DAVID individually and as Assistant
Principal of Randolph High School,

    Defendants.
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

    Plaintiffs Oreoluwa Salau and Joyce Stena assert race and age discrimination claims against the New York City Department of Education ("DOE"); Henry Rubio, Principal of Randolph High School; and Rosalie David, Assistant Principal of Randolph High School. Salau and Stena advance claims pursuant to 42 U.S.C. § 1981, the New York City Human Rights Law, and the New York State Human Rights Law. Stena also advances a Title VII discrimination claim pursuant to 42 U.S.C. § 2000e.

    Defendants now move for summary judgment in their favor. Because most of the defendants' challenged acts are not materially adverse to them, and because Salau and Stena have failed to present evidence that a jury could use to find that any of the acts that were in fact materially adverse were a pretext for discrimination, the Court grants summary judgment to defendants.

I.  BACKGROUND

    A.  <u>The parties</u>

Salau, a black woman, has been a science teacher in New York City since 1996. (Amended Complaint dated Aug. 26, 2009 ("Compl.") ¶¶ 19, 22; Defs.' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1") ¶ 4.) From 2001 to 2008, Salau taught at Randolph High School. Stena, also a black woman, has been a teacher at Randolph High School for the past nine years. (Compl. ¶¶ 37, 40; Defs.' 56.1 ¶¶ 69-70.)

Rubio has been the Principal of Randolph High School since November 2006. David served as a Randolph High School Assistant Principal from 1992 until 2009, when she retired. (Defs.' 56.1 ¶¶ 6-7; Pls.' Local Civil Rule 56.1 Statement of Undisputed Facts ("Pls.' 56.1") ¶¶ 6-7.) The DOE employed both plaintiffs during the period relevant to this lawsuit.

    B.  <u>Salau receives reprimand and discipline</u>

In January 2007, the parent of one of Salau's students filed a report with the DOE's Office of Special Investigations, alleging that Salau had "verbally harassed her child." (Defs.' 56.1 ¶ 13; Pls.' 56.1 ¶ 13.) Gerald Menengatos, an assistant principal, investigated the complaint. Based on Menengatos's findings, Rubio informed Salau by letter that the administration had "substantiated a complaint of verbal abuse" against her. (Defs.' 56.1 ¶ 15; Pls.' 56.1 ¶ 15.) Rubio sent an additional letter on January 25, 2007, summarizing a meeting between Rubio, Salau, and Salau's union representative. In that letter, Rubio stated that the investigation concluded that Salau "used language that tends to belittle or subject students to ridicule." (Defs.' 56.1 ¶ 18; Pls.' ¶ 18.)

That same month, Salau also received criticism of her teaching performance. David observed Salau's classroom performance and concluded that Salau's lesson rated "unsatisfactory." (Defs.' 56.1 ¶¶ 19-20; Pls.' 56.1 ¶¶ 19-20.) Barbara Poseluzny, another assistant principal, reached the same conclusion about a class Salau taught two months later. (Defs.' 56.1 ¶¶ 21-22; Pls.' 56.1 ¶¶ 21-22.) Concerned about the several ratings of "unsatisfactory," plus the substantiated finding of verbal abuse, Rubio called Salau into his office on April 13 to discuss her performance. Salau did not appear for the meeting, nor did she appear for subsequently

scheduled meetings with the principal on April 16, 27, or 30. (May 17, 2007 Letter from Rubio to Salau, Ex. I to Decl. of Issac Klepfish dated March 11, 2011.) Rubio wrote Salau on May 17, 2007 to inform her that her conduct "constitute[d] insubordination." (*Id.*)

One week after Rubio informed Salau of her insubordination, both Rubio and Poseluzny observed one of Salau's lessons and both concluded that the lesson rated "unsatisfactory." (Defs.' 56.1 ¶¶ 23-24; Pls.' 56.1 ¶¶ 23-24.) Finally, Sheldon Young, a representative from the Office of the Instructional Superintendent of the DOE, observed one of Salau's May 25, 2007 classes. (Defs.' 56.1 ¶ 27; Pls.' 56.1 ¶ 27.) He, too, concluded that the lesson rated "unsatisfactory." (Defs.' 56.1 ¶ 28; Pls.' 56.1 ¶ 28.)

Not surprisingly, at the end of the 2006-2007 school year Rubio rated Salau "unsatisfactory" on her Annual Professional Performance Review and Report. (Defs.' 56.1 ¶ 29; Pls.' 56.1 ¶ 29.) The principal indicated that this assessment reflected, among other things, Salau's unsatisfactory "[a]ttendance and punctuality," "[p]rofessional attitude and professional growth," and "[a]ttention to pupil health, safety and general welfare." (Salau's 2006-2007 Performance Evaluation, Ex. K to Klepfish Decl.)

In the fall of the next school year, a student reported that Salau "grabbed [his] arm, twisted it, and pointed [her] finger within inches of his face." (Defs.' 56.1 ¶ 31; Pls.' 56.1 ¶ 31.) Assistant Principal Menengatos again investigated the accusation and notified Salau by letter dated November 2, 2007 that he had substantiated the student's allegation. (Defs.' 56.1 ¶ 31; Pls.' 56.1 ¶ 31.) Although the DOE subsequently assigned Salau to an empty classroom at Randolph High School, (*see* Salau Decl. ¶ 14; Defs.' 56.1 ¶ 32), she had resumed teaching by the spring of 2008. On April 18, after returning to duty, a student alleged that Salau "smacked her on the forehead and pulled her hair." (Defs.' 56.1 ¶ 34; Pls.' 56.1 ¶ 34.) Administrators again reassigned Salau to a different classroom "until further notice." (Defs.' 56.1 ¶ 35; Pls.' 56.1 ¶ 35; Ex. N to Klepfish Decl.) Glenn Raysor, the assistant principal who had investigated the accusation, "substantiated [the] allegation that she had committed corporal punishment" and informed Salau of his determination. (Defs.' 56.1 ¶ 37; Pls.' 56.1 ¶ 37.)

3

The following fall—the fall of 2008—the DOE brought charges against Salau pursuant to New York Education Law § 3020-a and suspended her, with pay, pending a hearing. (Defs.' 56.1 ¶¶ 40-41; Pls.' 56.1 ¶¶ 40-41.) The DOE sought Salau's dismissal on the basis of the several substantiated charges of "corporal punishment, verbal abuse, insubordination and misconduct" during the 2006-2007 and 2007-2008 school years set forth above. (Defs.' 56.1 ¶ 39; Pls.' 56.1 ¶ 39.)

The parties arbitrated the allegations over the course of a four-day hearing in December 2009. Although the arbitrator ultimately determined that the DOE did not have admissible evidence to sustain certain of the charges, (Arbitrator's Opinion and Award dated July 23, 2010, Ex. U to Klepfish Decl.), she did, however, sustain three charges, including insubordination, and concluded that Salau had made inappropriate comments to her students. The arbitrator fined Salau $3,000 and ordered her to attend a course on classroom management. (*Id*. at 16.)

Salau challenged this award pursuant to Article 75 and Article 78 of the New York Civil Practice Law and Rules. (Def. 56.1 ¶¶ 55-56; Pls.' 56.1 ¶¶ 55-56.) The New York State Supreme Court rejected the challenge and confirmed the award. (*In re Salau v. N.Y.C. Dep't of Educ.*, Index No. 110908/10 (Dec. 20, 2010 Sup. Ct. N.Y. 2010), Ex. V to Klepfish Decl.)

      C.    <u>Stena is excessed</u>

In preparation for the 2007-2008 school year, Rubio and the assistant principals restructured the school curriculum. As part of that restructuring, most sophomores took Earth Science instead of Chemistry. (Defs.' 56.1 ¶ 90; Pls.' 56.1 ¶ 90.) This resulted in an increase in student enrollment in Earth Science and a decrease in enrollment in Chemistry, which became an elective upper-level course. Consequently, the number of Chemistry teaching positions at Randolph High School decreased from four to one. (Defs.' 56.1 ¶¶ 83, 91-94; Pls.' 56.1 ¶¶ 83, 91-94.) Union rules required that the teacher with the most seniority receive the sole Chemistry slot. Accordingly, Rubio assigned the single Chemistry position to the most senior teacher,

4

Daniel Davidson, who had seventeen years' experience compared to Stena's six. (Defs.' 56.1 ¶¶ 85, 95; Pls.' 56.1 ¶¶ 85, 95.)

As a result of the reduction in Chemistry positions, Stena had no Chemistry courses to teach during the 2007-2008 school year. On August 30, 2007, shortly before school started for the year, Rubio informed Stena that she had "been placed in excess." (Defs.' 56.1 ¶ 98; Pls.' 56.1 ¶ 98.) As an excessed teacher, Stena retained the same salary as she had received as an active teacher, but she did not have a class of her own. Instead, she covered classes for absent teachers. (Defs.' 56.1 ¶ 99; Pls.' 56.1 ¶ 99.) However, Davidson later retired and Stena became a full-time Chemistry teacher once again for the 2009-2010 school year. (Defs.' 56.1 ¶¶ 101-102; Pls.' 56.1 ¶¶ 101-102.)

### D. <u>Salau and Stena's evidence of discrimination</u>

Salau and Stena provide the following evidence of discrimination submitted in opposition to the DOE's summary judgment motion.

#### 1. *Allegedly racial comments*

- In November 2007, while discussing a dispute between a Hispanic student and a black student, Principal Rubio allegedly told Juan Medina, a former Randolph High School guidance counselor, that, "'Those people are not like us'" and "'African-Americans are hard to deal with.'" (Decl. of Juan Medina dated March 28, 2011 ¶ 2.)

- Assistant Principal Rosalie David allegedly said, upon swapping Salau's Earth Science class for an Ecology class, "maybe this will make you a better teacher. I think you said you have a PhD." (Decl. of Oreoluwa Salau dated May 27, 2011 ¶ 4.) David also allegedly accused Salau and Tetteh, another black teacher, of "rambling." (Salau Decl. ¶ 17.)

- Salau admits that "Rubio never made any comment which would indicate any anti-Nigerian or Black bias or animus." (Defs.' 56.1 ¶ 57; Pls.' 56.1 ¶ 57.) Stena likewise admits that neither Rubio nor David ever "made any comment which would indicate any anti-African bias or animus." (Def.'s 56.1 ¶¶ 130, 132; Pls.' 56.1 ¶¶ 130, 132.)

#### 2. *Numerical evidence of biased evaluations*

From 2007 to at least 2009, the percentage of teachers receiving "unsatisfactory" ratings who were black exceeded the percentage of teachers at Randolph High School who were black.

5

For example, five out of the nine teachers (56%) who received "unsatisfactory" ratings for the 2007-2008 school year were black, (Def. 56.1 ¶ 157; Pls.' 56.1 ¶ 157), but only 40 of the school's 120 teachers (33%) were black. (Def. 56.1 ¶ 156; Pls.' 56.1 ¶ 156.) For the 2008-2009 school year, black teachers received 8 of the 16 "unsatisfactory" ratings (50%). (Def. 56.1 ¶ 159; Pls.' 56.1 ¶ 159.) At the time, 37 of the school's 106 teachers (35%) were black. (Def. 56.1 ¶ 158; Pls.' 56.1 ¶ 158.) Neither Salau nor Stena provide any evidence whatsoever that any teacher who received an "unsatisfactory" rating did not deserve that rating.

### 3. Other circumstantial evidence of discrimination

Salau:

- Salau states that "Rubio reassigned two regents classes in my area in mid semester" from her to "a Caucasian teacher." (Salau Decl. ¶ 2.) Relatedly, she asserts that a white teacher, Linda Bohoritch, received five Earth Science classes in spring 2007 while Salau received two Earth Science classes and three Environmental Science classes. (Salau Decl. ¶ 6.)

- David allegedly assigned Salau a limited role in proctoring and grading the June 2007 Regents exams. As a result, Salau only graded Physics exams for one hour during the two-week grading period. Salau asserts that Caucasian teachers, unlicensed in Earth Science, were permitted to grade Earth Science exams while she sat idle. (Salau Decl. ¶¶ 7-8.)

- Salau believes that the student allegations against her were "staged" by the other teachers at the school. (Dep. of Oreoluwa Salau dated Feb. 9, 2010 at 106:3-7, Ex. A to Klepfish Decl. & Ex. 1 to Affirmation of Stewart Lee Karlin dated May 27, 2011 (additional pages).) Specifically, Salau says that on October 10, 2007, Linda Bohoritch interfered with her class and then reported her to the administration. Salau has not provided evidence that any other teacher "staged" a complaint. Salau also contends that the investigations into these complaints should have been conducted by Rubio, not assistant principals. (Salau Decl. ¶ 18.)

- Randolph High School administrators did not select Salau to attend a Regents conference in Albany to help author Earth Science questions. Salau contends that an untenured teacher who did not have an Earth Science license was sent instead. (Salau Decl. ¶ 9.) Salau concedes that it is possible that, in fact, the school sent nobody to Albany. (Salau Dep. at 70:13-15.)

- Upon being given a new office, Assistant Principal Menengatos discarded a painting of a black man holding a black child that had been hanging on the office's wall and he replaced it with a photograph of the school. (Salau Dep. at 85:07-23, 88:07-08.)

Stena:

- Stena asserts that the complaining student's account was internally contradictory. (Decl. of Joyce Stena dated May 26, 2011 ¶ 7.)

- Stena asked Rubio once if she could leave early for a doctor's appointment but "Rubio told [her] that he 'didn't care about [the] doctor's appointment," even though "Caucasian teachers had no problem leaving for a doctor's appointment." (Stena Decl. ¶ 15.)

- Stena asserts that "students were never disciplined when [she] filed a referral, making classroom management very difficult." (Stena Decl. ¶ 17.) She says that a student once hit her in the breast with a paper airplane, but was not disciplined. This same student "cursed out a Hispanic teacher named Ms. Myles, and was suspended for this . . ." (Stena Decl. ¶ 18.)

- Stena asserts that the school did not adequately protect her safety following an October 25, 2007 incident involving a parent who raised his voice and "kept getting closer and closer into [Stena's] face." (Referral dated Oct. 25, 2007, Ex. EE to Klepfish Decl.) Stena does admit that after this incident, the student was transferred out of her class. (Defs.' 56.1 ¶ 108; Pls.' 56.1 ¶ 108.) The DOE provides evidence that a security directive was issued preventing the aggressive parent from entering the school without an escort. (Memorandum dated November 13, 2007, Ex. GG to Klepfish Decl.) In any event, Stena states that when that parent later threatened a Hispanic teacher, the student was transferred from the school. (Stena Decl. ¶ 16.)

- Stena states that "Ms. David (AP) insisted that [she] sign the late log, even though [she] was just a few minutes late," even though a Caucasian teacher arrived even later than Stena, but did not have to sign the late log. (Stena Decl. ¶ 19.)

## II.    DISCUSSION

### A.    Summary judgment standard

Summary judgment is appropriate only if the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute of material fact exists, the Court "is to resolve all ambiguities and draw all

7

permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). Nonetheless, the party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of its factual assertions. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

B. Discrimination standard

Salau and Stena allege that defendants engaged in race and age discrimination in violation of 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). (Compl. ¶¶ 25, 35, 42, 49, 53.) Stena, but not Salau, also asserts a Title VII claim pursuant to 42 U.S. § 2000e, *et seq.* (Compl. ¶¶ 43.)

The Court analyzes all of Salau's and Stena's racial and age discrimination claims using the three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (applying the *McDonnell Douglas* analysis to NYSHRL and NYCHRL employment discrimination claims). The *McDonnell Douglas* framework provides that, once a plaintiff makes out a prima facie case of retaliation or discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802-03. If the defendant produces evidence of such a reason, the plaintiff must point in turn to evidence that would allow a reasonable factfinder to conclude that the defendant's reason is merely a pretext for discrimination or retaliation. *Id.* at 804.

A prima facie case of discrimination based on disparate treatment requires four elements: (1) the plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her membership in a protected class and the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

8

Of particular relevance here, an adverse employment action is "a materially adverse change in the terms and conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted),

> To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

*Id.* (citation, internal quotation marks, and ellipsis omitted).

    C.    <u>Salau has failed to raise a genuine dispute as to any material fact.</u>

        1.    *Most of Salau's allegations do not reflect materially adverse actions.*

Salau alleges more than a dozen instances in which defendants discriminated against her. The bulk of Salau's allegations, however, concern events that produced either no change in her working conditions whatsoever, or certainly no materially adverse change. For example, Salau asserts that she was only asked to grade a particular exam for an hour while another teacher got to grade for more time. (Salau Decl. ¶ 7.) Elsewhere, Salau complains that she had to teach Ecology instead of Earth Science and that she was not selected for a television interview or a trip to Albany. These are not materially adverse employment actions. "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Sank v. City Univ. of N.Y.*, 219 F. Supp. 2d 497, 503 (S.D.N.Y. 2002) (quoting *Phillips v. Bowen*, 278 F.3d 103, 117 (2d Cir. 2002)).

Only one subset of Salau's allegations arguably pass the test of constituting "materially adverse" actions: during 2007 and 2008, Salau faced accusations of verbal abuse and corporal punishment, suffered a reprimand for insubordination, received unsatisfactory evaluations, and endured a series of temporary assignments and suspension. An arbitrator ultimately substantiated only a few of the charges, fined Salau $3,000, and directed her to attend a course on classroom management. Considered together, the Court will presume that the DOE's decision to pursue

9

disciplinary action against Salau constitutes a materially adverse act for the purposes of the *McDonnell Douglass* analysis.

> 2. *The DOE has articulated a legitimate non-discriminatory reason for seeking disciplinary action against Salau.*

Although the Court will assume for the purposes of this opinion that Salau has made a prima facie case for discrimination related to the disciplinary charges against her, the Court finds that the DOE has articulated a legitimate, non-discriminatory reason for suspending Salau and pursuing disciplinary charges against her: it had a series of credible student and administrative complaints. (Section 3020-a Specifications against Salau, Ex. Q to Klepfish Decl.) Therefore, Salau must show that the DOE's reasons were false and present evidence that a jury could use to conclude that the reason for the disciplinary action against her was discriminatory animus based on race. *See St. Mary's Honor Ctr.*, 509 U.S. at 515-16; *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999). Salau has not met that burden.

> 3. *Salau has not offered evidence that would allow a jury to conclude that the disciplinary action against her was a pretext for race discrimination.*

The record shows that Salau addressed the merits of the charges against her during a four-day arbitration pursuant to Education Law § 3020-a. The findings of that quasi-judicial administrative action are entitled to preclusive effect. *Burkybile v. Board of Educ. of the Hastings-on-the-Hudson Union Free Sch.*, 411 F.3d 306, 311(2d Cir. 2005). Thus, there can be no genuine dispute that Salau acted insubordinately and demonstrated poor classroom management skills: the arbitrator resolved those issues, and the Supreme Court of New York affirmed the findings in a written opinion. (*In re Salau v. N.Y. C. Dep't of Educ.*, Index No. 110908/10 (Sup. Ct. N.Y. 2011), Ex. V to Klepfish Decl.)

To the extent that Salau's argument is that the DOE discriminated against her by pursuing the charges, that claim is not precluded because that claim was not in front of the arbitrator. *See Morey v. Somers Cent. Sch. Dist.*, No. 6 Civ. 1877, 2007 U.S. Dist. LEXIS 20265, at *21 (S.D.N.Y. March 21, 2007). Even so, Salau has failed to produce any record evidence to suggest

10

that the DOE's rationale is, in fact, false and that racial animus motivated its conduct. For example, Salau does not dispute that students lodged complaints of verbal abuse and corporal punishment against her. (Pls.' 56.1 ¶¶ 13, 31, 34.) Nor does Salau dispute that she received "unsatisfactory" ratings from multiple observers in 2006 and 2007. (*E.g.*, Pls.' 56.1 ¶¶ 19, 23, 27.) Nor does she deny that she was removed from active duty because students had made complaints against her. (Salau Dep. at 105:20-23.)

Rather, Salau contends that the administrators' ratings and investigation were biased and that the student complaints were "staged." (Salau Dep. at 106:05.) Salau's evidence: her own statement that on October 10, 2007 another teacher encouraged students to complain about Salau. (Salau Dep. at 107:20-25.) Even if this occurred, however, there is no factual basis for the jury to conclude that any of the administrators' actions based on the resulting student complaints stemmed from race-based animus or even that the complaints themselves were pretext. For example, though Salau contends that the events of October 10, 2007 unfairly caused a student to complain on October 12, that inference is precluded. The arbitrator determined that Salau raised her voice to a student, as she was alleged to have done. (Arbitrator's Opinion & Award 13, Ex. U to Klepfish Decl.)

The remainder of Salau's arguments rest only on her own conclusory statement that school officials targeted her because of her race. But these sorts of unsupported allegations do not suffice for her to be able to take this issue before a jury. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

Nevertheless, Salau does argue that she has three broad groups of evidence that a jury could use to find in her favor. First, she presents the Court with statements attributed to Rubio and David that she argues constitutes direct evidence of discrimination. Second, she presents the Court with what she refers to as statistical evidence of discrimination. Third, she offers sundry perceived racial slights. None save Salau's claims from summary judgment being awarded to defendants.

a. Discriminatory comments

The comments of Rubio and David do not create a genuine dispute about defendants' motives. Rubio is alleged to have said to the school's guidance counselor in November 2007 that, "'Those people are not like us'" and "'that African-Americans are hard to deal with.'" (Medina Decl. ¶ 2.) But, even assuming Rubio uttered these words, they are too attenuated in time from the decision to discipline Salau to conclude that the disciplinary charges were a pretext. *Cf. Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115-16 (2d Cir. 2007).

David's comments are even less significant. As Salau describes them, David's comments contain no obvious race-based animus and, even if they did, Salau did not show that David played any role in pursuing disciplinary action against Salau. Such stray remarks fail to demonstrate pretext. *See id.* at 115.

b. Numerical evidence

During Rubio's tenure at Randolph, the percentage of black teachers receiving "unsatisfactory" ratings exceeded the percentage of black teachers on staff. That differential tells the Court precious little. This analysis does not suffice to show pretext because Salau provides no context for these figures. For example, Salau does not offer any evidence that these other "unsatisfactory" ratings were undeserved, so there is no basis to believe any difference is due to race. *E.g.*, *Martin v. Citibank, N.A.*, 762 F.2d 212, 218-20 (2d Cir. 1985). Moreover, the sample sizes involved—approximately eight to ten teachers—diminish the value of this evidence because any difference may be statistically insignificant. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977).

c. Other evidence

Salau also offers other instances of perceived slights, disappointments, and inequities as circumstantial proof of discrimination. Much of this evidence is simply unintelligible to the Court because it is provided without any factual context, record support, or explanation. For example, Salau contends that, at some point, "Principal Rubio reassigned two regents classes in Dr. Salau's area" and that those classes were given to a less-qualified Caucasian teacher. (Salau's

Opp. 21.) But Salau has failed to indicate when this occurred, whether Salau received other class assignments, or any indication of whether similarly situated teachers faced like treatment. The jury could not possibly sustain a disparate treatment claim without additional evidence on that point. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010.)

In another instance, Salau urges the Court to impute racial significance to the fact that Menengatos, upon moving into a new office, discarded an old picture of a black man holding a black child and replaced it with a picture of the school. (Salau Dep at 85:7-19, 88:07-08.) The Court is not prepared to do so on this record. Moreover, the Court finds that this evidence does not show that the DOE's decision to discipline her was a pretext to discriminate, even when considered in combination with all of Salau's other allegations.

> D. <u>Stena has failed to raise a genuine dispute as to any material fact.</u>
>
>> 1. *Most of Stena's allegations do not reflect materially adverse actions.*

Stena—like Salau—alleges a wide variety of discriminatory acts, ranging from being denied the opportunity to leave early one afternoon for a doctor's appointment to providing ineffective discipline for students whom Stena referred to the principal's office. (Stena Decl. ¶¶ 15, 16-18.) But the proffered evidence—like Salau's—shows that most of these events produced no change in Stena's employment. For example, Stena received an "unsatisfactory" rating for the 2007-2008 school year, (Defs.' 56.1 ¶ 118; Pls.' 56.1 ¶ 118), but there is no evidence that this affected Stena's pay or job responsibilities. Similarly, Stena's complaint about missing a doctor's appointment and being required to sign the "late log," do not constitute anything more than inactionable "mere inconvenience[s]." *See Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004).

Only one action alleged by Stena—namely the DOE's decision to excess her—constitutes a materially adverse employment action because Stena's responsibilities changed significantly as a result of that decision.

      2.  *The DOE has articulated a legitimate non-discriminatory reason for excessing Stena.*

 Although the Court assumes for the purposes of this analysis that Stena has stated a prima facie case of discrimination based on the decision to excess her, the Court finds that defendants have provided a legitimate, non-discriminatory reason for that determination. Namely, the science courses were re-sequenced in order to improve student achievement. (Decl. of Henry Rubio dated March 11, 2011 ¶¶ 10-44, Ex. WW to Klepfish Decl.) The DOE further provided evidence that it filled the available teaching positions by seniority, as required by its collective bargaining agreement. (*See id.*; Article 17 of the DOE-United Federation of Teachers Contract, Ex. YY to Klepfish Decl.) The burden, therefore, shifts to Stena to produce evidence from which a jury could conclude the DOE's explanation is merely a pretext for discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 515-16; *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999). Stena offers no such evidence whatsoever.

      3.  *Stena has not offered evidence that would allow a jury to conclude that she was excessed as a pretex for racial discrimination.*

 Stena concedes that the DOE's explanation is largely accurate. She admits that the re-sequenced science courses reduced the number of Chemistry courses at Randolph, thereby reducing the number of Chemistry teaching positions. (Pls.' 56.1 ¶¶ 92-94.) She also admits that the DOE assigned the one remaining Chemistry teaching position to the teacher with the most seniority, as required by her union's collective bargaining agreement. (Pls.' 56.1 ¶ 95.)

 Stena does claim that the school restructured the science curriculum solely in order to displace her. (Stena Decl. ¶ 11.) Such a conclusory statement is insufficient to create a genuine dispute of fact, especially in light of the DOE's explanation that students would perform better in both Earth Science and Chemistry if the more basic course (Earth Science) preceded the more advanced course (Chemistry).[1]

---

[1] Indeed, the DOE has presented evidence that student performance in fact improved after the change. (Regents Exam Report Card, Ex. XX to Klepfish Decl.)

Further, to the extent that Stena relies on the same statements, numerical evidence, and deposition transcripts as Salau, the Court finds that they do not create a genuine dispute about why Stena was excessed. That evidence does not provide any causal link between Stena's race and the DOE's decision to excess her.

      E.    <u>Salau and Stena's other claims fail at the threshold level.</u>[2]

           1.    *Salau and Stena have failed to meet the procedural requirements to assert claims under the New York City Human Rights Laws or the New York State Human Rights Laws.*

Salau and Stena have not refuted, or even responded to, the DOE's argument that plaintiffs have neglected the procedures of New York Education Law § 3813. By not answering the DOE's arguments, Salau and Stena have abandoned those claims. *E.g.*, *Arias v. Nasdaq/Amex Mkt. Group*, No. 00 Civ. 9827, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003). Moreover, Education Law § 3813 requires plaintiffs who wish to assert claims against the DOE to file a Notice of Claim within 90 days of the date that the claim arises. *See* N.Y. Gen. Mun. Law § 50(e) (McKinney's 2010). Because this law applies to discrimination claims arising under the Human Rights Laws, Salau and Stena were obligated to give notice of their claims to the DOE. The record shows they have not done so. (Defs.' 56.1 ¶¶ 68, 136; Pls.' 56.1 ¶¶ 68, 136.)

           2.    *Salau and Stena have not factually supported their new allegations of hostile work environment.*

In their opposition papers, Stena and Salau assert for the very first time in this litigation that Randolph High School was a hostile work environment. Accordingly, the Court declines to consider that new claim. *Cf. Greenridge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006).

Even if the Court did consider such a claim, Stena and Salau have failed to show, as they must, that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that it constituted a hostile work environment. *Leibovitz v. N.Y. C. Transit Auth.*, 252

---

[2] Although each plaintiff claims in the Complaint that they were also discriminated against on the basis of their respective ages, they submit no evidence in that regard and in fact do not even mention the issue in their papers in opposition to summary judgment. They therefore have failed to raise a genuine issue of material fact in regard to their claim that they were discriminated against on the bases of their ages.

F.3d 179, 188 (2d Cir.2001) (*citing Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir.1999).

### III. CONCLUSION

Neither Salau nor Stena has provided evidence that would enable a jury to return a verdict in their favor. Salau and Stena direct their challenge to a litany of grievances, slights, and disappointments over the last decade. Many of those occurrences were not materially adverse, as required to make a prima facie case. And for those acts that were materially adverse, neither plaintiff can demonstrate that defendants acted out of race-based animus.

Accordingly, because "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), there is no genuine issue of fact for trial and summary judgment on all claims is appropriate. The Clerk of Court is directed to enter judgment in favor of defendants and to close this action.[3]

Dated: New York, New York
       February 14, 2012

SO ORDERED:

Sidney H. Stein, U.S.D.J.

---

[3] Plaintiffs Self, Peterkin, and Anderson have previously discontinued this action with prejudice. See Orders dated Nov. 29, 2010 (Dkt. Nos. 35, 36) and Feb. 9, 2012 (Dkt. No. 65).